v. Mitchell Good afternoon, your honors. May it please the court, counsel. My name is Daniel Cochran and I represent the defendant, Helen Wendell Mitchell, in this cause. Your honors, this jury of the defendant's peers, or in the alternative, reduce his sentence to a sentence of probation from the five years of concurrent sentences he has received at this time. Your honor, the court should reverse and remand this case for three reasons. First, the trial court erred in failing to suppress the confession of the defendant and denying its admission to evidence. Second, the defendant did not make it a knowing and understanding waiver of his right to a jury trial. Finally, the defendant's sentence was an abuse of discretion as the defendant should have been given probation as he met all the requirements of 730 ILCS 5-5-5-3E. Your honors, first, the trial court erred in denying the defendant's motion to suppress his confession as it was not made voluntarily. The standard review would be determining whether a trial court's proper rule on a motion to suppress findings of fact and credibility determinations made by the trial court were of great deference and we would reverse only if it meant against the manifesto of the evidence. However, the ultimate question posed by the legal challenge to the trial court's ruling on a motion to suppress is the note. Your honors, the defendant's confession is involuntary and inadmissible as he was induced to confess by a concurred promise of leniency and coercion on the part of the state. Your honors, the defendant's confession is not given voluntarily as inadmissible to trial. As the Illinois Supreme Court stated in People v. Hyde, a confession obtained under any promise of hope of unity is not admissible in evidence. Such a confession is not voluntary as any degree of influence used to obtain it by a person having authority over the crime charge or over the person of the prisoner. Whether such evidence is competent or incompetent depends upon whether or not the record shows the prisoner to have been influenced by the statements of the officer having custody of him or control of the charge against him amounting to duress or tending to raise in his mind a hope of leniency. In making the voluntary of his determination, we consider the totality of the circumstances surrounding the statement which would include the defendant's age, intelligence, education, experience, and physical condition at the time of detention or interrogation, the duration of the interrogation, the presence of Miranda warnings, the presence of any physical or mental abuse, and the illegality and duration of the detention. Your Honors, we are not contesting at this point that it was an absurdly long duration and interrogation. We are not contesting that there was physical or mental abuse provided by the State, nor that it was whether it was legal or not put into question by the State. Your Honor, this case is much more based on my defendant's lack of intelligence, ability to understand his Miranda warnings, and his ability to defend himself and remain steadfast in his denial of the allegations based on the coercion and implied promise of leniency by the State. Your Honor, this case can be analogized to the People v. Hyde where the defendant was taken to a police station on a robbery charge. And during the interrogation, he was told the best thing he could do was to tell the truth. And if that he told the truth, he would be taken to the State's attorney who would do the best for him. Now, even this vague promise of leniency or that the State's attorney would do his best for him was enough that the court reversed and remanded him as the confession given by the defendant should have been suppressed as involuntary based on a promise of leniency in that case. Your Honor, in this case, my client denied any wrongdoing when he was interviewed by Sergeant Burton and a DCFS investigator, Kathy Markson. He remained steadfast until Sergeant Burton told him that if he continued to deny, this would end up in a courtroom situation. And further, that if the alleged victim were able to tell her story to 12 jurors, she would certainly be believed. In this case, these statements indicate to my client that regardless of what I say or what I maintain, a jury is going to find me guilty, which brings me to my second point, Your Honor, which would be the level of intelligence possessed by the defendant in this case. Mr. Mitchell has a very low intelligence level. He was interviewed by Dr. Melissa Kinzer, who is a doctor of psychology. Her level of expertise goes more to body image issues, especially with younger women. However, there was no evidence presented by the State nor contradicted that she in any way was incapable of assessing the mental capabilities of my client or his ability to understand verbally given instruction or warnings. In this case, Dr. Kinzer came to the conclusion that Mr. Mitchell's IQ is 74. An IQ of 74 is borderline mentally deficient. Wasn't there testimony as to a working level? I believe it was 102. Yes, Your Honor. He had a working level. However, Dr. Kinzer also testified that the defendant has what's called concrete thinking. He takes what is told to him to be literal in every sense of the word, which would further his inability to defend himself who stated that if the alleged victim tells a jury of 12 that you did these things, they're going to believe her. He's going to take that literally. Further, she stated that he had a significant difference. She probably, the person who made this statement, meant it. Yes, Your Honor. But in his mind, with his level of intelligence, it would be inferred that no matter if I did this or not, if they're going to believe the statements that have already been made, it doesn't matter what kind of defense I put on them. Because if she's believed, I'm going to be convicted. And in this case, it was further stated that he has significant difficulty comprehending information presented to him verbally, and he processes all information slowly, and it must be given to him repeatedly again and again if he's to be expected to understand it. He also either does not know or misunderstood much of what is considered to be common knowledge in our culture, making it difficult for him to make informed decisions about topics that he is unfamiliar with. And in this case, that would include Miranda warnings. Miranda warnings are not the easiest thing for everyone to comprehend. As the Court knows, cases are seen repeatedly, year after year, day in, day out, based on the voluntariness of Miranda warnings and a confession given afterwards. Finally, Dr. Kinzer stated in her report, it would have been highly unlikely that Mr. Mitchell could have understood his Miranda rights, the implications of the allegations, and the consequences of his written confession. Furthermore, had he not understood the significance of his Miranda rights, as I suspect, he would not have grasped that he had the option to stop the questioning and ask for an attorney at that point. When we look at the totality of the circumstances in this case, Mr. Mitchell had only had one run-in with the law 15 years prior. He was charged with a felony. However, the case was dismissed. He did not proceed far into the process, and Mr. Mitchell did not experience a similar situation to what he did in this case. Other than that, he has had no run-ins with the law. He possesses no legal training. He had probably never been to see an attorney on a regular basis. Therefore, Mr. Mitchell would not be expected to have a working knowledge of this information, and verbal fashioning would be very difficult for him to understand. There was no evidence put on the state to rebut that, other than the officer testified that he had no trouble answering yes or no questions. Well, even a very mentally deficient person can answer yes or no because they know it's a 50-50 shot. I either need to answer yes or I need to answer no to this question. However, that does not mean he was capable of understanding the full consequences of his Miranda rights or a signed confession in this manner. Did anyone testify that he couldn't understand his Miranda rights? Dr. Kendra was the only person who testified that... Did the doctor talk about the Miranda rights? She did. It was part of her report, and she suspected that he would not have grasped the consequences of his Miranda rights or the consequences of his written confession, and he would probably have had difficulty understanding that he could stop the questioning and request an attorney. It was based on her interview with him and his testing on certain equivalency scales. It would be that he would have great difficulty understanding these concepts. Did the defendant testify at the motion hearing to suppress the confession? The defendant did not testify at the suppression hearing, Your Honor. So he never said, I didn't understand, or... I mean, the only evidence we have is the psychologist saying he would have trouble understanding. Yes, Your Honor. Other than his request to file a motion to suppress on this basis, he did not testify, Your Honor. Your Honor, the second point, the defendant did not make a knowing waiver of his right to a jury trial. As the first history of state and people be ruies, an individual's right to a jury trial is a fundamental constitutional right. Although the defendant may wisely waive his right to a jury, in order for that waiver to be valid, it must be made understanding, which brings us back to this point with Mr. Mitchell. It's going to be very difficult for him to understand anything that's presented to him in a verbal fashion. This principle is codified in Section 103-6 of 725 ILCS Chapter 5. Every person accused in an offense shall have the right to a trial by jury unless understandingly waived by defendant in open court. Is there something that the trial judge should... some admonishment that he should have given that he didn't? Some advisement that he should have that he didn't? Your Honor, it was not that the trial court did not advise Mr. Mitchell of his rights. The trial court did go through his right to a jury trial on what he was waiving. However, this brings us back to our one-size-fits-all admonishment. It's not appropriate for every defendant. Mr. Mitchell would have great difficulty understanding things presented to him verbally. And how do we know he didn't understand? Your Honor, this is... What evidence is there in the record that he didn't understand? Your Honor, the only evidence to be based on the reports of the psychologist, Dr. Kinzer, who stated that based on his intelligence level and her interviews with him, his ability to answer questions with her and to answer test questions, it would be... it's concluded that it would be very difficult for him to understand things put to him verbally. They would have... she stated that they would have to be repeated to him again and again. Whereas, as we all know on the trial court level, he's going to have an admonishment read to him which advises him of his rights, which Judge Morris did so. It's a very standard admonishment. However, it was gone through rather quickly as it normally is. And at the end of it, Mr. Mitchell just said, yes, you understand, yes. At the end, he said, I understand. Or he said, yes, do you understand? Yes, I do. Or whatever. And that brings us back, Your Honor, to his inability to understand what was going on here. We're essentially dealing with a person that is mentally retarded. Just as in any other situation where we're dealing with a child, things have to be admonished to them repeatedly, sometimes explained in much more depth than to the average person. Well, now let's back up a little. I thought that you had... if you were a 70 below or below a 70, you were classified as mentally retarded. You say he's mentally retarded, but he's got a 74. Your Honor, Dr. Kinzer also testified to the fact that there is no discernible difference between a 74 and a 69 IQ level. Well, what about a 75, I wonder? I do not know, Your Honor. She did not testify to that, to where the line would be where you seem to be. But in other words, he did qualify as retarded because he was a 74 instead of a 69. Correct, Your Honor. And that's why I believe she made the finding there and stated there is no discernible difference between the two. But she never said my score is a plus or minus 4? She did not, Your Honor. Okay. It was not requested. That information wasn't asked by either defense or prosecution in the case, to my knowledge. Your Honor, in this case, there was a signed jury waiver. However, it was originally signed only by the defendant's counsel. And it was filed in early September of 2008. There was a second form filed after it was found to be inadequate, which had a blue line drawn onto the document, which would indicate to me that it was not prepared in anticipation for Mr. Mitchell to sign off on that waiver. It was not intended for him to actually do that. It seems to be very hastily created. That is not something stated in the record, Your Honor, but that is based off an inference from legal documents of my own type prepared in a formal fashion and presented to the court in that manner. The only experiences I've had through interning and as an attorney is when something is handwritten. It occurred at the last second. It didn't just, you didn't discuss it with your client previously, explain it to him at length. It just happened that day. But there was no record to show that it was signed after he waived the jury? I'm sorry. It wasn't, I mean, after the trial, there's no, nothing to say it was signed later. No, Your Honor. There's no evidence that it was signed afterwards. Absolutely not, Your Honor. In this case, the circumstances based on Mr. Mitchell's intelligence level and what seems to be no evidence of this ever being explained to him other than on the day of his bench trial to a person who has undisputed inadequacies in understanding verbal information, it would be very difficult, close to possible, based on the only expert opinion given, that Mr. Mitchell could have understandingly waived his right to a jury trial in this case. And for those reasons, we would ask that it be remanded for a trial by a jury of his peers. Which, to make note of it, Mr. Mitchell didn't even understand what a jury of his peers was when he was When did the interview with Dr. Kinzer occur in the context of all this? Wasn't it before he waived his jury? It was before, Your Honor. And the trial judge knew about his mental deficiencies then at the time that he went through the admonishments? He did, Your Honor. All right. But it kind of gets me back to, I mean, what else should he have done? What are you saying, what else should the trial judge have done to determine that he understood that he was waiving his right to a jury trial? Your Honor, I think in this defendant's position, and for most of our mentally challenged defendants, a repetitive admonishment, more than a single read-through, would be necessary in case we're defendants. More than a single what? I'm sorry. More than a single read-through of those rights. A single pass-through would be very difficult for him to understand. It would need to definitely be done more slowly and probably more individualized with each step of the rights he's waiving and the consequences of waiving those rights. Is there any authority for different levels of admonishments? There is not, Your Honor. And I searched high and low, which actually brought me to my problem with where we're at here, is because we do have defendants that are varying, varying levels of intelligence, from the most intelligent white-collar criminal to the lowest of the low guys stealing out of campus. And we have one admonishment that fits for them all, but does not take into account the fact that not everyone can comprehend what's happening. Not everyone understands what these rights are and what they mean to them. I didn't fully understand these rights until I spent years in law school and interning at a law school in New York. And in this case, the defendant was waiving one of his most dear rights to an American citizen, as a jury, to be tried by a jury of your peers, to tell your stories to 12 other individuals who might have been through a similar experience and might find in you a favor. At this point, my client was basing his information off being told that if there's a jury involved, this little girl is going to be believed. And after a single read through of his rights and his limited intelligence and involvement with the legal system, he waived that right and opened court. However, based on Dr. Kinzer's report, without any other testimony that my client would have easily understood what was going on, or anything to rebut other than the fact that the officer testified he had no difficulty answering questions, which most of which are yes and no questions, then it would be very hard to believe that my client understood the full impact of what he was doing that day. And if someone doesn't understand the consequences of his actions at that point, I don't know how it can be stated that he understood that he waived his right to a jury trial. Your Honors, finally, the defendant's sentence was an abuse of discretion in this case, as he should have been given probation, as he met all the requirements of 730 ILCS 5-5-5-3E. As the court stated in People v. Margentina, a sentence within the statutory limits will not be disturbed absence of abuse of discretion. In other words, if the sentence diverges from the spirit and purpose of the law. The first interest stated in People v. Kasanovich, both the Illinois Constitution and the design of the Unified Code of Corrections require that penalties be determined not only according to the seriousness of the crime, but also according to the rehabilitative potential of the offender with the intent to restore him to useful citizenship. So I believe it's all our goal that if someone commits a crime, they are sent to prison or they are sentenced in some way, our goal is to get them back into society and to become useful members of society. The sentence was within the statutory scope, right? Yes, Your Honor, the sentence was within the scope. Pursuant to the statute, a defendant convicted of aggravated criminal assault of a family member, the court shall consider the safety and welfare of the victim and may impose probation where it finds A or B or both are appropriate. And the court orders the defendant to pay the victim's counseling services to the extent the court finds, after considering the defendant's financial assets, that the defendant is financially capable of paying for such services. If the victim was under 18 years of age at the time of the offense was committed, it requires counseling as a result of the offense. Sections A and B state in part that the defendant is willing to undergo a court-approved counseling program for a minimum duration of two years, or the defendant is willing to participate in a court-approved plan including, if not limited to, the defendant's removal from the household, restricted contact with the victim, continued financial support for the family, restitution for harm done to the victim, and compliance with any other measures that the court may deem appropriate. Mr. Mitchell did testify at his testimony in both sections A and B. Was he employed at all during this period of time? He was, Your Honor. He was a coal miner by profession. Coal miner? Yes, he was. He was essentially the single income of the household. As stated by his wife, Mrs. Mitchell, she only had an income outside of his, about $50 a month. She did some seamstress work for some people, basically friends of the church. Without Mr. Mitchell's income in the household, she is essentially left destitute and ought to be begging for scraps at this point, Your Honor. Mr. Mitchell agreed that he would comply with any counseling the court saw fit, whatever it was. He would pay restitution to the victim if the court ordered him to do so. He not only agreed to continually financially support his family, but he also testified to the devastating effect it would have on his household if he was sentenced to a period of incarceration if he could not support his wife at this point in time. Mrs. Mitchell also testified that the victim and her mother no longer lived in the household, nor do they come to the household. And it had been almost two years, or just over two years, since the last time Mr. Mitchell or his wife had contact with the alleged victim and her mother. Mrs. Mitchell testified she would assure that Mr. Mitchell would never have contact with the victim again. She also stated she would take steps that children weren't even allowed to come to their house, not just the alleged victim, but that no children would be in contact with their home. And in this case, there would be no need to remove Mr. Mitchell from the home as the victim no longer lived there. She lived there at the time of the allegations. However, her mother and her moved out of the home a period of time after that. They actually lived in the home for a significant period of time after the alleged victim made the allegations to her mother and Mr. Mitchell's wife. Thank you. Counsel? May it please the Court. Counsel, my name is Sharon Shanahan and I represent the people of the state of Illinois. I want to just very briefly mention before I get started on my argument that a misconception that comes up in the defendant's brief is that the error here is based on Miranda. The defendant was not in custody at the time this happened and I spent the beginning portions of my written brief discussing the evidence that clearly establishes that he was not in custody. Your argument would be what difference does it make if he didn't understand Miranda, if he wasn't entitled to Miranda anyway? Well, even with Miranda warnings, I just want to make sure we understand we are not in a custodial situation and I think the defendant's brief leads one to believe that. We do recognize that even when Miranda compulsion and inducement. So the underlying issues are the same, but I think it's a distinction worth noting is that he was not in custody. As to promises of leniency, in order for there to be compulsion, the statement must be coupled with the suggestion of a specific benefit that will follow if the defendant confesses. For example, in the case that the defendant just cited, the Hyde case, the defendant was told that he would be taken to the state's attorney and he would be given leniency. That's a very specific promise. In Kellerman, the other case cited in the defendant's brief, they said that they had the state's attorney on the phone and they were ready to give him a three or four year plea. That's a very specific benefit. In this situation, there was no specific benefit. There was no benefit at all. There was no benefit ever offered to the defendant. Sergeant Burton simply told the defendant what would happen next. And she encouraged him to tell the truth. It's not a specific benefit to say your granddaughter said this, your daughter said this, and the next thing that's going to happen is it's going to go to trial. There's a good chance that they will be believed. There's no benefit in those statements that are cited in our brief. It very specifically says that statements like that are not coercion and they do not make a statement involuntary. The fact that someone has a hope or a belief that something good is going to come from their confession is not enough to find coercion. In fact, the courts have said that there is no public policy to castigate a confession merely because it may have been prompted by the accused's hope that cooperation might increase his chances of a lenient sentence. And in Peeble v. Foster, this court said the hopes of a defendant are insufficient to support a claim that his confession was induced through promises of leniency. The Foster court also said that beliefs arising internally from the confession was induced by a promise, and that's exactly what we have here. Sergeant Burke simply told the defendant, okay, here's what we're going to do next, and it would be a good idea if you told the truth. There is no inferred promise. The defendant comes close to saying that a specific benefit is, if you confess, I will do this. He's saying, now, I will do this, and somehow there's this unspoken thing, but I won't do it if you confess. And that was never in here. And there was never any, I mean, all she said was, look, this is what's going to happen next. It's sort of the opposite of a promise. So there was no benefit offered to the defendant at all. Going on to the issue of whether the defendant is capable of confessing, defense counsel today has admitted that the duration of the interrogation, there was no physical or mental abuse, and that the detention was legal. The presence of Miranda warnings is another issue to be concerned, and he was warned, and so he did know the consequences. And I would note, contrary to what the defendant seems to think, Miranda rights are not deep, difficult, legal concepts. The Miranda rights are, you can have an attorney if you want one. You don't have to pay for the attorney. If you can't afford it, we'll pay for it. You don't have to talk, but if you do talk, we can use what you say against you. They're not hard concepts. Well, and despite that, a defendant's expert testified that they'd be hard for him to do what the Miranda rights are, I take it. Well, first of all, I would say that the defendant's expert, her conclusions don't match her examination of the defendant. Second of all, the expert never stated which information in Miranda the defendant wouldn't understand. She just kind of made this amorphous statement that he wouldn't understand Miranda. She says, well, he doesn't understand the concept of jury of your peers. Well, there's nothing about jury of your peers in Miranda. None of these concepts are concrete concepts. They're abstract concepts. Miranda's pretty concrete. Pardon? Miranda's pretty concrete. You think so? The idea of a jury of your peers is not an abstract statement? There's nothing about jury of your peers in Miranda. I think the idea of an attorney and what an attorney does is something abstract or concrete. Again, there's nothing in Miranda about what an attorney does that you can have. I know. I understand. That's why I'm saying, these abstract concepts that need some basic understanding, some sort of conceptual understanding, they are not concrete, such as that is a four-legged table and there are two chairs behind it. Well, I guess we have a difference of opinion there, but I would go on to say that I think that the test results that Dr. Kenser found in the defendant lead to the conclusion that he most certainly could understand what was said to him. In her written report, she says the defendant's IQ was 74. In her testimony, she said it was 75. I noticed the same thing, Justice Welch, that you noticed, is if there's no difference between 74 and 79, if there's no difference down and there's no difference up. Second of all, we're talking about things that these Miranda rights were carefully read to the defendant. He did read them himself, but they were also read to him. Dr. Kenser says that the defendant's verbal IQ was 81. Now, that's in the average range. As Justice Goldenhurst, as you noted, his working memory was 102. That's above average, and working memory is, and this is from Dr. Kenser's report, the ability to hold information presented verbally in one's memory and then formulate an appropriate response. Now, that seems exactly like you read a line of Miranda, do you understand it, yes or no? Then you read the second line. That's working memory, and she said he had a good ability to listen to what was understood and what was told to him verbally and then formulate an appropriate response, and she admitted that he had a good short-term memory. Her opinion, after she says all these things, that he's got a verbal IQ of 81, that he's got a working memory score of 82, and that he's got a good short-term memory, when she then turns around and says that the defendant doesn't understand verbal language, and that's what she said, he doesn't understand verbal language, and that's why he didn't understand what he was doing when he decided to confess, that simply doesn't make sense. How can you say all these? The best things about her report was his verbal IQ, and then she says he doesn't understand it, and I gave you one case that I could have given you 50 that says it's simply because a psychologist expresses the opinion that the defendant is not confident, that does not mandate a similar finding by the trial court. This was the trial court's decision to decide not, and the fact that she was the only expert there doesn't have anything to do with it. The information, furthermore, that's not the only thing that the trial court had to decide. This is the trial court's decision, and he doesn't have to believe the expert, and given the fact that the expert's opinion doesn't make much sense, I think it's reasonable that he didn't consider it. I think when you see the record in this case, and you see this handwritten confession that the defendant wrote out, I mean, it's pretty, I take it back, it's not on the record, but he did write it out himself, and there was quite a bit of discussion about what was in it. He didn't have to write it himself. We get a lot of cases where we have a confession, but in reality the police officer has totally written it, typed it, whatever, and the only thing in the defendant's hand is the signature at the bottom, and of course it comes up time after time after time, is that really what the defendant said, or is that what the police officer says? In this case, there's no doubt that this confession was in the defendant's own hand. But you said it's not part of the record? No, I don't think it is, because I'm looking at my notes here, I'm pretty sure it's not, but on cross-examination they asked the defendant, he said, she told me what to write, and I just wrote it. But then he admits that the part of the confession where it says that he felt sorry that he felt Tiffany's tit, he said, no, the police officer didn't tell me to say that. Please forgive me, I know it was wrong, I turned to the defendant, and I'm very sorry for myself. He admits he wrote that, he admits the police officer did not tell him to say that. I hope Tiffany can forgive me, he admits he wrote that, he admits the police officer didn't tell him to say that. It happened right before they left, I mean, and that's exactly what the victim said. It happened right before, he admits he wrote that, he admits the police officer didn't tell him that. Furthermore, what this court can't consider is the defendant's testimony at trial. In this issue and in the following issue about the waiver of the jury trial, they've tried to present this as a man that just can't take care of himself, can't do anything. The fact of the matter is he finished his sophomore year of high school, he got a general equivalency degree, so he's got the equivalent of high school education, he's got a driver's license, he's pretty well worked all of his life, he's had no trouble getting along, he got on that stand and he testified on his own behalf, his testimony is coherent, he was rigorously cross-examined, he stood up to that cross-examination and answered the questions reasonably and clearly, and the trial court, this court can take into account that fact. This court doesn't have the opportunity to see the defendant in this case and to make its own determination of how much the defendant could or could not understand. The trial court could do that and did do that, and that's what's in purview, is what it is. And I think when you look at all these things, there's no doubt that this confession was not coerced, and very similarly that his waiver of jury trial was not coerced. Justice Stewart, you asked about whether the psychiatrist or psychologist asked the defendant what a jury of his peers was before or after he pled guilty. Well, she asked him that before. And the interesting thing is that after she explained to him what that was, she asked him, why do you think that would be a good idea? And I'm paraphrasing here, but basically he said, well, it's probably because they'd have a fairer view of things. So he understood before the, even before the motion to suppress, he did know what a jury of his peers was. We've got not one, but two signed waivers in there, and an accused is, the first one's not signed by the defendant, but an accused is presumed to speak to his counsel, and through this entire process, the defendant never objected to the fact that he was being tried without a jury. Two weeks later, he files a second waiver. This crude line, I've seen, where the defendant's signature is, I haven't done much trial work, but I've seen it on so many court documents where somebody suddenly thinks about something that they need to add to a document, and it's handwritten in there. And the line for the defendant's signature is a handwritten line. It's on there, but most importantly, there is a very thorough admonition of the rights that the trial court gave to the defendant. Now, today, defense counsel says it was gone through very quickly. It's just like every good judge does a waiver of jury trial. He explains what you're giving up, what you have the right to do. All the things, they're all in there. He thoroughly admonished the defendant. This is a defendant that does have experience with the court system. He was charged with a very serious felony in the past. Before you run out of time, that's what I'm worried about. Could we talk about sentencing and discussion about aggravation and mitigation? Well, first of all, I really do not understand defense counsel's reliance on 5-5-3, because 5-5-3 makes it more difficult to place a defendant on probation, not less. It's harder, not easier.  So they can't even consider probation under this statute unless all those conditions are met. That's where you start from. It's not, if you meet all those conditions, you have to get probation. That's the absolute opposite of the intent of this statute. This statute intends to make it more difficult to put a father, or a mother, or a grandfather, or an uncle, or a stepfather right back in the home where the victim was. That's the purpose of this statute. It's the minimum criteria for probation. And the thing that's very important in this record is that the record indicates that this little girl was not the only victim. And although he was not charged or convicted with these other assaults, other allegations of sexual assault to family members can be considered by a front court in sentencing the defendant. Now this sentence comes just right in the middle of the appropriate sentences. It just couldn't have been any more squarely in the middle of things. And the trial court gave two good reasons for not giving him probation. One was for the protection of the public. The sex offender evaluation and the author of that sex offender evaluation, Marilyn Fraley, where both the report was admitted and Ms. Fraley testified, she found the defendant to be at a high risk to fail probation due to his denial of the offense. I thought he had a confession. So he denied the confession? I beg your pardon? He confessed. That's why I thought there's not a denial. He said, at trial, he said, right then I just wrote down what the police officer told me to. So in his view, no, there was no confession. Were there any prior instances other than this time you mentioned? Is he a prior felon or prior this or whatever? Well, as I said, there are several other children that he's sentenced to. Not convictions, but there was evidence that he had, that she was not his only victim, that there were sexual assaults of other family members. I believe the rest of my argument on the sentencing is contained in my brief. Thank you, Counsel. Counsel? Thank you, Your Honor. I would just briefly like to respond as to the sentencing issues and to finish some of my argument that I gave to you earlier. In this case, my client was not ever convicted of any other crime. He's a first offender. First convicted offender. Is that what you're saying? Yes, Your Honor. He's never been convicted of offense. The case discussed by the prosecution would be a case that was dismissed against my client. Was it presented at the sentencing hearing? Was that evidence of that case, even though it was dismissed, presented at the sentencing hearing? Yes, it was part of his precinct's investigation report, I believe. And what did that show? Just that the case had been dismissed. But what was the case? Your Honor, it escapes me at this time. I forgot what his original... It was a sexual case? It was not a sexual case, Your Honor. Like deceptive practices or theft? I believe it was something along those lines, but it did not involve a sexual molestation case or anything to do with a family member or any way correlate to this case, Your Honor. But I thought counsel said there were other cases. There was an allegation that was brought up to the defendant when he was originally interrogated that his daughter, who would be the mother of the victim, had said there were also cases when she was a child. However, that was never reported anywhere or brought up at any other time. It was not multiple... Did she testify under oath? She did testify, Your Honor. However, this was the first time this had come to light to the defendant. My other point would be, as to his sex offender evaluation, as the court noted, in this case, the defendant gave a confession at one point, then denies giving a confession, denies what's contained in that confession, but then is listed as a high risk to fail probation because he will not admit he didn't. So in this case, if you maintain your innocence even past the conviction, you're going to be high risk. You shouldn't be qualified for probation because you won't sit down and say, you know what? You got it. I did it. Well, if a person genuinely believes they did not commit this crime, why should they be relegated to a position where they must admit to doing this crime in order to even be open to probation? And as the court stated, these requirements of 5 slash 5S5S3E make it harder to get probation. Yet Mr. Mitchell qualifies for all of them. And they are put in place so you can't just put an offender back in the home with the victim. The victim wasn't in this home. The victim hadn't been in this home in two years, and there was no indication the victim would ever return to the home or ever be in the presence of the defendant again in his life. Also, as we're going to talk about reports contradicting themselves, as counsel made such great strides to as to the expert and my client's IQ level, in this case, he's a high risk to fail probation in a sex offender report. However, he's a low risk of recidivism. So I'm not sure how you're a high risk to fail probation and not be able to abide by not harming further children, yet you pose a low risk to commit that crime again. That's completely contradictory to this. The only reason he was listed as high risk is because he wouldn't sit down and say, I didn't. And to this day, Mr. Mitchell maintains he did not do it. I'm here for that single purpose. And in this case, the evidence presented and also evidence of neighbors and people in the community, the ones that Mr. Mitchell is being incarcerated to protect, are that he has an excellent reputation in the community. People cannot believe that he would do something like this. And therefore, the evidence seems to show that if Mr. Mitchell did do this, which he maintains to this day that he did not, he is not a high risk to do this again. He is one of the few people that should be qualified for probation after being convicted of a sex offense. He stated that he will do everything required of the court, any type of monitor, any type of restitution, counseling, avoiding children. He's okay with all of them. All he wanted to do was to put this behind him, go back to work and support his wife as he had always done. But at this point, my client receives a middle-of-the-road, as it's been described, sentence, yet he's a first offender. Normally, first offenders don't get the middle-of-the-road. That's why we have a minimum as well as a maximum. And that's also why there is a statute providing for the possibility of probation, because there are apparently circumstances where probation is appropriate. And in this case, that was skipped directly over, and essentially the court weighed heavily on the fact that my client maintained his innocence even after a conviction, which I believe is as right as American to maintain that innocence even after a conviction, because I believe we're all aware of cases where people have been convicted by juries, bench trials and otherwise that are later overturned, whether it's from new evidence, DNA, et cetera, because they actually didn't do it. What if those individuals had to sit down? They should have had to say, probation or a lesser sentence? Because it turns out sometimes people didn't do it. And that's not what we're here to decide. However, my client doesn't meet all those qualifications, and as a first-time offender, it is against the spirit and purpose of the law which are provided to allow for probation, even in these circumstances, to sentence my client to five concurrent terms of five years in prison. Thank you. Thank you, Counsel. We appreciate the briefs and arguments. The Counsel will take the case under advice of the Court's Attorney.